**SUBURBAN HOMES CORP.,**
Respondent-Appellant,

v.

**Annine HARDERS et al.,**
Petitioners-Appellees,

and

**Porter County Drainage Board,**
Respondent-Appellee.

No. 3–277A47.

Court of Appeals of Indiana,
Fourth District.

May 7, 1980.

Rehearing Denied July 9, 1980.

Donald E. Cochran, Westville, for respondent-appellant.

John F. Hoehner, Valparaiso, for respondent-appellee.

CHIPMAN, Judge.

This controversy arises out of a proceeding instituted by Suburban Homes Corporation (Suburban) to establish a legal drain pursuant to the provisions of the Indiana Drainage Code.[1] The Porter County Drainage Board granted Suburban's petition to establish a legal drain; however, the Porter Circuit Court reversed the decision of the Board finding there was lack of substantial evidence to support the Board's determination that the drainage area in question was a mutual drain and the Board lacks jurisdiction to entertain a petition to make only a portion of a mutual drain a legal drain. Suburban now appeals from the decision of the Porter Circuit Court raising the following issues for our review:

1) Whether there was substantial evidence before the Board to support its decision that the proposed legal drain was a mutual drain, and

2) Whether the Board had jurisdiction over Suburban's petition to make only a portion of a mutual drain a legal drain.

Affirmed.

The dispute which underlies this entire proceeding arose when Annine Harders constructed an earthen dam on her property in

---

1. Ind.Code 19–4–1–1 et seq.

November of 1974, apparently to impede the flow of water from the land owned by Suburban. The evidence shows that prior to Suburban's development on the land on the north side of county Road 500 North, (see map)[2] which involved substantial earth moving and regrading, there existed a natural watercourse which carried a limited amount of surface water and some subsurface water from the lands within the watershed south to Salt Creek. However, the watercourse was dry much of the time and only had water in it after it rained. As Suburban Homes moved earth, trees and grass during development, the flow of water increased, prompting Mrs. Harders to

construct the earthen dam on her property. As a result of the dam construction, part of the property of both Suburban Homes and Annine Harders was inundated with water.

■ On November 12, 1975, Suburban filed with the Porter County Drainage Board a "Petition To Make Mutual Drain A Legal Drain", requesting the portion of the natural drainage area located predominately on the land of Mrs. Harders (referred to in the petition as the "Suburban Homes drain") be declared a legal drain and thereby be subjected to the jurisdiction and control of the Drainage Board. Suburban proceeded under Ind.Code 19–4–5–3(c) which provides:

"(c) Any owner of lands affected[3] by a mutual drain may file a written request with the board to make the mutual drain a legal drain and subject to the provisions

---

**2.** This map has been prepared for the benefit of the reader; it is not a reproduction of an exhibit, nor is it intended to reflect dimensions and locations with any great accuracy.

**3.** Ind.Code 19–4–1–2(3) defines "affected lands" as:

"  .  .  . lands which are benefited or damaged by the improvement and which are situated within the watershed drained by the improvement; "

of this act. Upon receipt of such request the board shall fix the date, time and place for a hearing thereon, which hearing shall not be less than thirty [30] days thereafter. Not less than twenty [20] days before the date of hearing the owner making the request shall cause a notice to be served on the owners of all lands affected thereby, which notice shall state the date, time, place, and the purpose, of the hearing. Service of the notice shall be (1) in the manner set forth in article two, section 207 of this act, or (2) in the manner summons are served in civil actions. Any owner of lands affected by the mutual drain may, on or before the date of hearing, file with the board written evidence for or against the granting of the request. At the hearing the board shall consider all of the evidence filed, and if it finds that the owners of more than fifty per cent [50%] in acreage of the lands affected by the mutual drain will be benefited if the drain is made a legal drain and subject to the provisions of this act, and if the board further finds that the benefit to those owners benefited is likely to be greater than the damages which may be suffered by those owners damaged by reason of the mutual drains being made a legal drain, it shall make written findings so stating and issue an order granting the request. Prior to adjournment of the hearing the board shall announce its findings and order, and this announcement shall constitute notice to all affected persons. If judicial review is not requested pursuant to article eight of this act within twenty [20] days from the date of notice of the order, the findings and order shall become conclusive."

Therefore, it was incumbent upon Suburban to prove not only that the establishment of a legal drain on Harders' property would result in an overall benefit to affected land owners, but also that the proposed legal drain was a "mutual drain", as defined by Ind.Code 19–4–1–2(14), i. e. "a drain running through the lands of two [2] or more persons and established by their mutual consent . . . ."

## I. EVIDENCE OF A MUTUAL DRAIN

Suburban argues there was substantial evidence before the Board to support its finding that the proposed Suburban Homes Drain was a mutual drain as defined by the code. Specifically, Suburban relies on the following evidence:

1) Certain field tile was laid by the Wilkinsons in the 1960s to facilitate drainage of their farmland; this land drains through the property of Suburban Homes and into the proposed legal drain.

2) Many years ago, at a time when the county maintained Road 500 North,[4] a four foot by four foot concrete box culvert was built under the road for the passage of drainage water. Smaller ditches were constructed along the roadside so water from the road would flow into the drainage area.

3) Harders built an earthen dam across the drainage area in November of 1974 and inserted therein a ten inch pipe, thereby (according to Suburban Homes) indicating her acquiescence in the use of the drainage area as a mutual drain.

Appellees argue there was a lack of substantial evidence to show the proposed legal drain was a mutual drain. They contend the lower court relied heavily upon the statutory definition of "mutual drain", specifically that portion which reads "a drain . . . established by . . . mutual consent . . . ." Because the drainage area in question was a natural watercourse, the circuit court reasoned the drain was established by nature, or was naturally occurring, and was not established by the mutual consent of the parties:

"The fact that an open natural watercourse benefits two or more people or has mutual benefits is not sufficient evidence

---

4. At the time this proceeding was instituted, the county no longer maintained County Road 500 North.

to establish that said watercourse is a 'mutual drain'. The statute is clear that said drain must be established by mutual consent of two or more owners, not established by nature to the mutual benefit of two or more owners. If two property owners got together and agreed to dig a ditch across their land to drain them, this would be a 'mutual drain' because they established it by digging and by agreement. That is not the case here."

We are therefore faced primarily with a problem of statutory interpretation. This court must decide whether the legislature intended the phrase "established by their mutual consent" to describe a situation in which a drain is actually constructed or founded by the parties in question (or by one party with the consent of others), or whether a natural watercourse, used by the parties for many years to drain their respective lands, can be said to be thereby "established by their mutual consent" so as to be deemed a mutual drain as defined by statute. We hold the trial court correctly interpreted the mutual drain provision of the Drainage Code and properly reversed the decision of the Porter County Drainage Board.

■■ A fair reading of the statute supports the trial court's holding that the natural watercourse in this case is not a mutual drain. A statute must be construed as a whole, *In re Big Raccoon Conservancy Dist. v. Kessler Farms Corp.*, (1977) Ind.App., 363 N.E.2d 1004, giving words their plain, ordinary and usual meaning. *State v. Turner*, (1979) Ind.App., 386 N.E.2d 208; *State v. Bress*, (1976) Ind.App., 349 N.E.2d 229. "Establish" is commonly defined as "to bring into being; to build; to create; to form; to found". Black's Law Dictionary 712 (4th ed. 1968). Applying the term's ordinary meaning to the statutory definition of mutual drain leads one to conclude that a mutual drain is an artificial drain, actually constructed, built or created by the mutual consent of the landowners through whose property it runs. Had an alternative

meaning been intended, it surely would have been a simple matter for the drafters to have used the words "used by the parties with their mutual consent" or "improved by the parties to their mutual benefit". Subsection (b) of Ind.Code 19–4–5–3 tends to support this interpretation of the code's mutual drain definition. It provides that when all owners of lands affected by a mutual drain request the Drainage Board to assume jurisdiction over the drain, a surveyor must determine "whether the mutual drain meets standards of design and construction" as set forth in Ind.Code 19–4–1–9.[5] This reference to mutual drains seems to describe an artificial drain which is built or constructed by the landowners, hence the requirement that the county surveyor check standards of design and construction.

Such an interpretation in no way precludes a county from subjecting a natural watercourse to the provisions of the Indiana Drainage Code as is argued by Suburban Homes. A petition may be filed under Ind. Code 19–4–2–1 to establish a "new legal drain". Ind.Code 19–4–2–10 provides that in preparing plans for construction of the proposed new legal drain, the county surveyor shall:

"[D]etermine the best and cheapest method of drainage, the termini and route, location, character of the proposed work, and fix the same by description. * * * The surveyor, in locating the line of work of drainage, *may vary from the line described in the petition* as he may consider best, and he may fix the beginning and outlet so as to secure the best results. He may determine what the method of drainage shall be either by *removing obstructions from a natural* or artificial *watercourse; by diverting such watercourse from its channel; by deepening, widening or changing the channel of such watercourse,* . . . *or by any combination of these methods.*" (emphasis added)

Therefore, the provisions of the Drainage Code which relate to the establishment of a

---

5. Ind.Code 19–4–1–9(2) directs the county surveyor to "prepare, and make public, standards of design, construction and maintenance that will apply to all legal drains . . . .".

new legal drain clearly provide that the new drain may be established where a natural watercourse presently exists.

In short, we do not believe the laying of field tile and the construction of the box culvert in this case can be said to have established the drain in question.

We therefore hold the trial court properly concluded there was a lack of substantial evidence before the Porter County Drainage Board to show the proposed legal drain was a mutual drain. Because of our resolution of this issue, we need not address the second issue presented by the appellant. The judgment of the trial court is affirmed.

MILLER, P. J., and GARRARD, P. J. (sitting by designation), concur.