

FILED

Apr 21 2015, 8:25 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

John J. Schwarz, II
Schwarz Law Office, PC
Hudson, Indiana

ATTORNEYS FOR APPELLEES

Eric H. Burns
Reid D. Murtaugh
Withered Burns, LLP
Lafayette, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Pamela Frazee, <br><br> *Appellant-Plaintiff,* <br><br> v. <br><br> Douglas J. Skees and <br> Angela D. Skees, <br><br> *Appellees-Defendants.* | April 21, 2015 <br><br> Court of Appeals Case No. <br> 79A04-1406-PL-269 <br><br> Appeal from the Tippecanoe Superior Court <br><br> The Honorable Gregory J. Donat, Judge <br><br> Cause No. 79D04-1205-PL-18 |

**Najam, Judge.**

## Statement of the Case

Pamela Frazee filed a complaint against Douglas and Angela Skees ("the Skeeses"), which arose out of a dispute regarding a subsurface drain running through the parties' properties in Tippecanoe County. In her complaint, Frazee

alleged property damage, nuisance, and criminal trespass. The Skeeses filed a counterclaim alleging negligence, nuisance, criminal trespass, and invasion of privacy. All parties sought damages pursuant to the Crime Victim's Relief Act, Indiana Code Section 34-24-3-1. Following a bench trial, the trial court found in favor of Frazee on her nuisance claim and in favor of the Skeeses on their trespass claim. The trial court awarded attorney's fees to both parties, and it awarded treble damages to the Skeeses. Frazee now appeals, and the Skeeses cross-appeal. Collectively, they present several issues for our review, which we revise and restate as follows:

> 1. Whether the trial court erred when it concluded that the subsurface drain was a mutual drain.
>
> 2. Whether the trial court erred when it concluded that the Skeeses did not abandon their rights in the subsurface, mutual drain.
>
> 3. Whether the trial court erred when it concluded that the Skeeses did not trespass when they connected a perimeter drain to the subsurface drain.
>
> 4. Whether the trial court erred when it concluded that Frazee was solely responsible for the costs of repairs made to a broken portion of the subsurface drain that ran through her property.
>
> 5. Whether the trial court erred when it determined that Frazee committed a criminal trespass and when it awarded treble damages and attorney's fees to the Skeeses pursuant to the Crime Victim's Relief Act.
>
> 6. Whether the trial court abused its discretion when it awarded

attorney's fees to Frazee.

[2] We affirm the trial court's conclusions that the subsurface drain was a mutual drain and that the Skeeses did not abandon the drain. Thus, we also affirm its judgment that the Skeeses did not trespass when they connected their perimeter drain to the subsurface drain. Further, we affirm the court's conclusion that Frazee was solely responsible for the costs of the repairs that she had made to the portion of the subsurface drain that ran through her property. However, we reverse the trial court's judgment that Frazee committed a criminal trespass, and, therefore, we also reverse the award of treble damages and attorney's fees to the Skeeses. Finally, we reverse the trial court's award of attorney's fees to Frazee.

## Facts and Procedural History

[3] Frazee and the Skeeses are neighbors with a contentious relationship. Their properties border the southbound side of U.S. Highway 52 ("Highway 52") in Tippecanoe County. The Skeeses' property ("the Skees Parcel"), which they acquired in 1997, sits north of Frazee's property ("the Frazee Parcel"), which she purchased in 2006. A portion of the Frazee Parcel extends north and west, parallel to the Skees Parcel. A strip of land owned by Tippecanoe County ("the County Parcel") divides the eastern boundary of this part of the Frazee Parcel and the western boundary of the Skees Parcel. The Skees Parcel has a higher elevation than the County Parcel, and the County Parcel has a higher elevation than the Frazee Parcel. All properties sit atop a high water table, and, in 2011,

when the current dispute arose, the area had received more rain than normal. Surface water naturally drains westward along a natural swale from the Skees Parcel at Highway 52, across the County Parcel and towards the Frazee Parcel.

[4]     Approximately seventy to eighty years before the current dispute, a clay tile drain ("the subsurface drain" or "the drain") was placed under the property now owned by the Skeeses, the County, and Frazee. The subsurface drain began, as four-inch pipe, on the Skees Parcel at Highway 52, and it traveled along the path of the swale. Near the point where the Skees Parcel intersected the County Parcel, the subsurface drain expanded from a four-inch clay tile drain to a six-inch clay tile drain. The six-inch clay tile drain then traveled through the Frazee Parcel and, eventually, emptied into a nearby stream.

[5]     At some point,[1] Frazee installed an open-loop geothermal system on her property, which discharged its waste water into the six-inch subsurface drain. During the installation of the geothermal system, Frazee discovered that a portion of the subsurface drain under her property had been crushed by tree roots and, as a result, did not function properly. Thus, to properly complete the geothermal system, Frazee had to repair the subsurface drain. Her repair replaced the broken section of the clay tile drain with new, six-inch plastic drain pipe, which connected at a blowout.

---

[1] The record is not well developed with respect to the times various events occurred. As such, we simply refer to a number of events as having occurred "at some point" after a prior event.

[6]     Subsequently, in March 2011, Frazee began construction on the second of two barns on her property, both of which now sit southwest of the County Parcel and west of the Skeeses' home. The second barn sits directly atop the natural swale. When Frazee began construction on the second barn, on March 11, 2011, she revisited the blowout to check the functionality of the subsurface drain. When she did, she found free-flowing toilet paper and sewage in the subsurface drain. Frazee called the Tippecanoe County Health Department ("Health Department") to report her findings.

[7]     Ron Noles, the Chief Environmentalist at the Health Department, received Frazee's call. Noles went to the Frazee Parcel, and, after he had viewed the blowout to confirm the presence of sewage in the subsurface drain, Noles searched the County's records for the septic systems of the homes immediately adjacent to the Frazee Parcel. Noles discovered Frazee's record but could not find records for the Skeeses' home or for another of Frazee's neighbors, the Dearths.[2] Consequently, Noles ordered dye tests of those septic systems, which involves the flushing of florescent green dye down a toilet within a home. Noles conducted the dye test at the Skeeses' home on March 22, and the dye appeared at the blowout on the Frazee Parcel that same day, indicating a positive test for sewage from the Skeeses' home.

---

[2] The Dearths are not now, and have never been, a party to this action.

[8]    The Health Department confirmed that the Skeeses' system was inadequate, which had resulted in the discharge of sewage onto the Frazee Parcel.[3] At the time of the dye test, the Skeeses' home operated on its original septic system, which lacked an absorption field and was deemed to be too small. The Skeeses' home was also found to be improperly plumbed. The sewage from only one bathroom emptied into the old septic system, but the remainder of the home emptied into its basement floor drain, a four-inch clay tile drain. The basement floor drain, in turn, connected to the subsurface drain. The Skeeses had inspected their septic system when they purchased their home, but that inspection did not reveal any problems. Before the dye test, the Skeeses did not know about the sewage discharging into the subsurface drain and onto the Frazee Parcel.

[9]    As a result of the investigation, the Health Department issued abatement orders to the Skeeses and the Dearths, which directed them to fix their septic systems in order to stop the discharge of sewage onto Frazee's land.[4] The Health

---

[3] Noles performed a dye test at the Dearths on March 31, which also indicated a positive test for sewage at the blowout. The septic system for the Dearths' home was also inadequate, but the Dearths had another, compliant septic system on an adjacent property that they owned. They connected their home to that system and fixed their sewage problem. After that, the Dearths had no further involvement with the Health Department.

[4] The presence of sewage in a subsurface drain violates an Indiana State Department of Health Rule, *see* 410 Ind. Admin. Code 6-8.3, and Tippecanoe County Ordinance 99-30-CM. The ordinance incorporates Title 410, Article 6, Rule 8.1 of the Indiana Administrative Code, a provision repealed on January 1, 2011. *See* Ind. Reg. LSA Doc. No. 09-7 (Aug. 19, 2010). Although that provision was repealed before the dispute arose in this case, the parties also cite to Rule 8.1. Rule 8.1 was repealed and replaced by Rule 8.2, which has also since been repealed and replaced by Rule 8.3. *See* Ind. Reg. LSA Doc. No. 12-156 (Oct. 19, 2012). Nevertheless, Rule 8.3 considers a failure of "residential on-site sewage system" to be a violation of the Indiana State Department of Health Rules. 410 I.A.C. 6-8.3-55. A failure includes "discharge[] from the on-

Department issued its order to the Skeeses on March 24, and it demanded the installation of a compliant septic system by April 25. However, due to the large amounts of rain the area had received in early 2011, the Skeeses were unable to install a new septic system, which should be placed in dry soil, by April 25. In the interim, the construction of Frazee's second barn continued, and, during that process, an auger struck the subsurface drain, which caused sewage to discharge onto the construction site. Rather than repair the subsurface drain along its original line, Frazee rerouted the drain around the north side of the barn and swale.

[10] To remediate the problems with their septic system, the Skeeses first re-plumbed their home to route all waste water to the new septic system, once installed. The Skeeses, however, kept their furnace's condensation pipe connected to the basement floor drain. Next, when the rain relented in July, the Skeeses installed a new septic system with a finger absorption field. At the same time, the Skeeses' contractor dug a hole at the end of the septic's finger system, near the County Parcel, and severed the Skeeses' connection to the subsurface drain. The contractor placed a boulder inside of the hole over the now-severed connection to prevent a future reconnection but left the hole open and the

site sewage system causing contamination of a potable water supply, ground water, or surface waters." 410 I.A.C. 6-8.3-33.

boulder exposed to allow ground water to continue to flow into the hole and, ultimately, leach into the subsurface drain through its clay. With the connection severed, the hole would fill with water and eventually overflow into the swale.

[11] On July 27, the Health Department found that the Skeeses' new septic system made their home legally compliant. Initially, the Skeeses' new system worked properly and Frazee had no more issues. However, the disconnection of the Skees Parcel from the subsurface drain, in conjunction with the accumulation of rain, made the already high water table rise higher, which interfered with the proper functioning of the new septic system. For the septic system to function correctly, the water table had to be lowered. Consequently, to lower the water table, the Skeeses placed a submersible sump pump into the hole near the County Parcel, where the contractor had severed the Skeeses' connection to the subsurface drain.

[12] Subsequently,[5] on November 28, Frazee discovered flooding in one of her barns. Frazee followed the water flowing into her barn to the hole on the Skees Parcel and the sump pump. She called Noles but could not reach him, and so she called the police. Someone with the police department called Douglas Skees, who explained the situation, and the police allowed Douglas to continue

---

[5] It is not clear how much time passed between the Skeeses' placement of their sump pump and the flooding on the Frazee Parcel.

pumping. Frazee disagreed with the police, and she entered onto the Skees Parcel and unplugged the pump.

[13] When Douglas came home from work that afternoon, he found the pump unplugged, and he plugged it back in. But, that night while the Skeeses slept, Frazee again entered onto their property and unplugged the pump a second time. As a result, the water table rose, which caused water to back up through the basement floor drain inside the Skeeses' house and flood the Skeeses' basement with eight to ten inches of water.[6] Several of the Skeeses' household items were damaged by the water. Shortly thereafter, the Skeeses resumed pumping from the hole. The Skeeses also had to install a pump in their basement to remove the standing water.

[14] Noles returned to the Skees Parcel twice in December. On December 6, Noles went to the Skees Parcel to determine whether they were pumping sewage effluent from the hole. To do so, Noles placed dye directly into the septic system via its outside cleanout. The dye appeared in the hole on December 15, which indicated that sewage was still traveling to the Frazee Parcel by means of the swale into which the water from the hole was being pumped. As a result, the Skeeses were directed to stop pumping from the hole. They did so but, nevertheless, the ground water containing the septic effluent would eventually fill the hole, run over into the swale, and make its way to the Frazee Parcel. Thus, Noles determined that more work was needed to remediate the Skeeses'

---

[6] The water also flooded the new septic system, and, consequently, the Skeeses had to have it pumped.

sewage problem. As a result, the Health Department filed a lawsuit seeking to enjoin the Skeeses' discharge of sewage onto the Frazee Parcel.

[15] In the interim, on December 9, Noles met with Douglas Skees and an excavator, Mark Remley, at the Skees Parcel. Noles observed ponding in the hole, which would then overflow into the swale and discharge offsite onto the Frazee Parcel. In an effort to find a pipe that might be feeding the now-disconnected subsurface drain, Remley dug two more holes on the Skees Parcel. He dug the first that day near Highway 52 but did not find any drain pipe. However, a hole dug near the Skeeses' home revealed the clay tile drain that led to the basement floor drain. The basement floor drain connected to the otherwise-severed subsurface drain.

[16] To ensure compliance and to find a solution to the Skeeses' septic problem, Noles involved the State Board of Health and a soil consultation firm. The consultation firm determined that the area's

> soil has a seasonal high water table at or above the surface during wet periods.

> Because of the wetness characteristics, a perimeter or curtain drain is needed to help make this [septic] system function properly during wet periods. Surface water should also be directed around this system to keep water from flowing across it.

Frazee Exh. 58. Accordingly, pursuant to a Stipulation of Agreement between the Health Department and the Skeeses, the Skeeses agreed to install a perimeter drain around the septic system's absorption field, which would

"significantly reduce migration of ground water into the real estate's septic absorption field . . . [and] enhance the functioning of the septic system." Appellees' App. 4-5. The perimeter drain would then connect to the portion of the subsurface drain located on the County Parcel, thereby reestablishing a connection between the Skeeses' drainage and the subsurface drain. The perimeter drain would collect the same amount of water as the subsurface drain originally had before it had been disconnected. Therefore, the perimeter drain would not increase the downstream burden placed on the subsurface drain.

[17] On January 11, 2012, with the Indiana State Department of Health, the Tippecanoe County Sheriff's Department, Noles, the Skeeses' attorneys, and Frazee present, the Skeeses installed a four-inch perimeter drain around their septic system's absorption field. However, when they attempted to tie into the subsurface drain on the County Parcel, Frazee sat down in the way of the backhoe and blocked access to the necessary dig site for two hours. The contractor continued to bill the Skeeses for the time that work was delayed. The Sheriff warned Frazee that she would be arrested for trespass if she continued to block access to the subsurface drain after a certain time, and she moved only when that time expired. When work resumed, at the direction of the Health Department, the Skeeses severed their basement's connection to the subsurface drain. Further, at two locations, they capped with concrete the portion of the subsurface drain that ran underneath the new septic system.

[18] After the Skeeses' connected the perimeter drain to the subsurface drain, Frazee claimed that her barns flooded more often, and, at some later time, she installed

a curtain drain on the barns' eastern side, near the County Parcel's property line, and she also replaced the remainder of the original subsurface drain west of her barns to its outlet at a nearby creek with six-inch plastic drain pipe.[7]

[19] On March 29, Frazee filed an action in Tippecanoe Superior Court. Frazee filed an amended complaint on May 29. In her amended complaint, Frazee alleged a nuisance claim based on the discharge of sewage onto the Frazee Parcel. And, based on the connection of the perimeter drain to the subsurface drain, Frazee alleged that the Skeeses had committed criminal trespass, and she sought damages under the Crime Victim's Relief Act. In particular, Frazee alleged that the connection of the perimeter drain to the subsurface drain caused the subsurface drain to collect more water than it originally captured from the Skees Parcel, which resulted in a greater downstream burden on the drain and more frequent flooding of her barns.[8]

[20] The Skeeses filed an answer and counterclaim on June 29, which alleged negligence, nuisance, criminal trespass, and invasion of privacy, and they also sought damages under the Crime Victim's Relief Act. However, at trial, the Skeeses pursued only their allegation of criminal trespass and damages under the Crime Victim's Relief Act. The Skeeses alleged that Frazee had committed

---

[7] To run the subsurface drain to the creek, Frazee had to alter the original route of the drain. The owner of the land where the subsurface drain historically had discharged into the creek would not allow Frazee to run the new drain through his property, but Frazee received permission from another landowner and ran the drain through that property instead.

[8] Frazee also alleged a claim for property damage based on the Skeeses' "filling [a sinkhole] with various materials, which subsequently washed into Frazee's subsurface drainage system." Appellant's App. at 33.

criminal trespass when she entered onto their property to disconnect the sump pump the second time, which resulted in the flooding of their home.[9]

[21]     The trial court held a two-day bench trial on February 27 and March 18, 2014. In relevant part, the trial court entered the following findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A):

> 1. [Frazee], [the Skeeses], and Tippecanoe County (County) each own parcels of real estate in Tippecanoe County[,] which are located generally to the south and [west] of US 52 South.
>
> * * *
>
> 9. Many years prior to the parties' purchase[s of their respective parcels], the Skees Parcel, the County Parcel, and [the] Frazee Parcel had all been served by a single[,] four[-]inch diameter[,] clay subsurface drain[] . . . starting at or near US 52 at the northeast and draining all three (3) parcels toward the southwest into the open drainage ditch located offsite of all (3) parcels.
>
> 10. The drain[] . . . was a mutual drain when originally installed and at all times thereafter.
>
> * * *
>
> 12. Frazee was responsible to repair any breaks in the mutual [drain] on her property.
>
> * * *

---

[9] The Skeeses also alleged that Frazee trespassed on their land when she blocked access by the perimeter drain to the subsurface drain. However, Frazee was located on the County Parcel at the time of this alleged trespass.

37. Frazee also chose to replace the original 4" clay drain pipe on her property with a 6' [sic] plastic pipe to the southwest of her second pole barn. [The] Skees[es] are not liable for claimed damages on this issue since the repairs to her mutual drain on her property were her responsibility and done for her own convenience.

38. . . . [The] Skees[es] were violating the law by draining their septic through the [subsurface drain].

39. Frazee never gave the Skees[es] . . . permission to pump sewage onto or through her property. . . . The Tippecanoe County Health Department ordered [the Skeeses] to remediate within 30 days.

40. The Skees[es] did not remediate the problem within 30 days[.]

* * *

43. During this time frame, the area in which the Skees[es] and Frazee lived was experiencing record[-]breaking levels of rain. It was the rainiest and wettest that [the] Skees[es] had seen . . . since the[y] first moved into the home.

44. The Skees[es] pumped water [from] the open hole closer to Frazee's property onto the surface in the direction of Frazee's property.

* * *

46. . . . It was established that . . . the water was effluent coming from the Skees[es] septic system. Effluent is water that has drained from a septic system. . . . Ron Noles ordered the Skees[es] to stop pumping. . . . However, the effluent had been pumped on[to] Frazee's property for approximately 10 days.

* * *

Conclusion[s] of Law[]

1. A Nuisance is defined as "[w]hatever is; (1) injurious to health; (2) indecent; (3) offensive to the senses; or (4) an obstruction to the free use of property; so as essentially to interfere with the comfortable enjoyment of life or property is a nuisance, and the subject of an action." Ind[.] Code [§] 32-30-6-6. The discharge of sewage under the property of Frazee and the pumping of ground water containing effluent and sewage onto the surface of Frazee's property is a nuisance per se. . . .

* * *

3. The original four[-]inch clay drain . . . running under and draining the Skees, County, and Frazee [P]arcels wa[s,] and at all times and remained, a mutual drain under Indiana Code [Section] 36-9-27[-2.]

4. The mutual drain's use continued throughout the time period at issue [because] at least two (2) of the three (3) original property owners used and were benefited by the mutual drain at all times without interruption or abatement.

5. [The] Skees[es] never abandoned the use of the mutual drain but suspended its use temporarily at the direction of the Tippecanoe County Health Department while intending to resume normal use when the septic problem was solved.

6. Pursuant to [Indiana Code Section] 36-9-27[-2], a property owner is obligated to fix an obstruction, or break, in the portion of mutual drain on their [sic] property.

* * *

8. [The] Skees[es are] entitled to the receipt of compensatory damages . . . as follows:

a. Delay due to work stoppage for two (2) hours[:] $400.00

b. Flood damages to personal property and furnishing[:] $899.00

   Total Compensatory Damages[:] $1299.00

9. [The] Skees[es are] entitled to three (3) times the amount of compensatory damages outlined in paragraph 8 above pursuant to [Indiana Code Section] 34-24-3-1 and [Indiana Code Section] 35-43-2-2(a)(1) and (2)(version a) for a total amount of treble damages [of] $3897.00

10. Pursuant to [Indiana Code Section] 34-24-3-1[](3) [the] Skees[es] are also entitled to a reasonable attorney fee[,] which is found to be in the amount of $1299.00

The Court finds for [Frazee] [a]s to her claim in the sum of $5,000 together with attorney[']s fees of $1667.00 for a total of $6667.00[. A]fter set off for Defendant[s'] counter-claim[,] judgment is entered for [Frazee] against [the Skeeses] in the sum of $1471.00 plus court cost[s] of $104.00.

Appellant's App. at 13-21. This appeal ensued.

# Discussion and Decision

### *Overview & Standard of Review*

Frazee challenges the trial court's findings and conclusions thereon, which it entered pursuant to Trial Rule 52(A).

When a party has requested specific findings of fact and conclusions thereon pursuant to Ind. Trial Rule 52(A), the

reviewing court may affirm the judgment on any legal theory supported by the findings. In addition, before affirming on a legal theory supported by the findings but not espoused by the trial court, the appellate court should be confident that its affirmance is consistent with all of the trial court's findings of fact and the inferences drawn from the findings. In reviewing the judgment, we must first determine whether the evidence supports the findings and second, whether the findings support the judgment. The judgment will be reversed only when clearly erroneous. Findings of fact are clearly erroneous when the record lacks any evidence or reasonable inferences from the evidence to support them. To determine whether the findings or judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom, and we will not reweigh the evidence or assess witness credibility.

*Capps v. Abbott*, 897 N.E.2d 984, 986 (Ind. Ct. App. 2008) (citations omitted).

[23] Frazee's arguments on appeal involve various aspects of Indiana's drainage statutes but primarily concern how Indiana Code Section 36-9-27-2 defines a "mutual drain" and a "private drain." That provision states:

"Mutual drain" means a drain that:

(1) is located on two (2) or more tracts of land that are under different ownership;

(2) was established by the mutual consent of all the owners; and

(3) was not established under or made subject to any drainage statute.

* * *

"Private drain" means a drain that:

> (1) is located on land owned by one (1) person or by two
> (2) or more persons jointly; and
>
> (2) was not established under or made subject to any
> drainage statute.

Ind. Code § 36-9-27-2.

[24] Thus, this appeal requires that we interpret a statute. As we have explained,

> [s]tatutory interpretation is a function for the courts, and our goal
> in statutory interpretation is to determine, give effect to, and
> implement the intent of the legislature as expressed in the plain
> language of its statutes. The first rule of statutory construction is
> that words and phrases shall be taken in their plain, or ordinary
> and usual, sense.

*Clark Cnty. Drainage Bd. v. Isgrigg*, 966 N.E.2d 678, 680 (Ind. Ct. App. 2012),

*aff'd on reh'g*, 966 N.E.2d 678.

[25] In previously interpreting Indiana Code Section 36-9-27-2, we have held that "a mutual drain is an artificial drain, actually constructed, built[,] or created by the mutual consent of the landowners through whose property it runs." *Suburban Homes Corp. v. Harders*, 404 N.E.2d 629, 632 (Ind. Ct. App. 1980). A natural watercourse is not a mutual drain. *Id.* And we have concluded that a private drain constructed on a common estate, which is subsequently subdivided, transforms into a mutual drain at the moment of subdivision. *Johnson v. Kosciusko Cnty. Drainage Bd.*, 594 N.E.2d 798, 803 (Ind. Ct. App. 1992).

[26] With this in mind, Frazee presents us with a plethora of arguments. Distilled, Frazee asserts that the trial court erred when it concluded that the subsurface drain was a mutual drain. Instead, she contends the Skeeses unlawfully connected an illegal sewage drain to her private drain. But even if the subsurface drain was a mutual drain when established, she contends, the Skeeses abandoned their rights to that drain. Thus, Frazee reasons, the subsurface drain was either (1) always her private drain or (2) became her private drain when the Skeeses allegedly abandoned it. As such, her argument continues, the Skeeses trespassed when they later connected their perimeter drain to the subsurface drain.

[27] In light of the above, we address Frazee's specific arguments as follows: (1) whether the subsurface drain was a mutual drain when it was established; (2) whether the Skeeses abandoned any interests they had in the subsurface, mutual drain; (3) whether the Skeeses trespassed onto Frazee's property when they connected their perimeter drain to the subsurface drain; and (4) whether Frazee alone is responsible for the costs to repair the portion of the mutual drain located under her property. After addressing those arguments, we also consider (5) whether the trial court erred when it concluded that Frazee had committed a criminal trespass when she disconnected the Skeeses' sump pump the second time, and (6) whether the trial court abused its discretion when it awarded attorney's fees to the Skeeses.

## Issue One: Mutual Drain When Established

[28] Frazee contends that the trial court's conclusion that the subsurface drain was a mutual drain when established is clearly erroneous. In this regard, she asserts that the trial court's conclusion is inextricably premised upon the following purportedly erroneous findings of fact: (1) a single, four-inch, clay-tile drain had historically served the three properties involved; (2) the subsurface drain began at or near Highway 52; and (3) the subsurface drain diverted water from the Skees Parcel. In addition, Frazee asserts that the trial court erred as a matter of law when it determined that the subsurface drain was a mutual drain when established because no evidence was offered that the subsurface drain was created by the mutual consent of all landowners served by the drain.

[29] Frazee's first two claims of error challenge two of the trial court's findings of fact: (1) a single, four-inch, clay-tile drain had historically served the three properties involved; and (2) the subsurface drain began at or near Highway 52. However, these findings do not implicate the statutory definition of a mutual drain, which speaks only of property ownership, consent, and establishment of the drain. *See* I.C. § 36-9-27-2. The statute does not concern the diameter of a drain pipe or its exact starting point on a particular tract of land. *See id.* Thus, even if the trial court's findings in this regard were clearly erroneous, the findings do not warrant reversal because "they amount to mere surplusage and add nothing to the trial court's decision." *Bell v. Clark*, 653 N.E.2d 483, 489 (Ind. Ct. App. 1995). We, therefore, do not consider them further.

[30] Frazee's next argument, that the subsurface drain diverted water from the Skees Parcel, presents a mixed question of law and fact. With regard to the facts, Frazee contends that the portion of the subsurface drain located on the Skees Parcel diverted only sewage, not water, from the Skeeses' property. Instead, she asserts, the swale—a natural watercourse, which is not a mutual drain, *see Harders*, 404 N.E.2d at 632—provided the sole method of water drainage from the Skees Parcel. Frazee reasons that this fact, as a matter of law, precluded the classification of the subsurface drain as a mutual drain. In other words, Frazee contends that the subsurface drain was not a single mutual drain but actually two separate, connected drains: an illegal sewage drain on the Skees Parcel that unlawfully connected to a separate private drain on the Frazee Parcel. We disagree in both respects.

[31] Although the natural swale did drain surface water from the Skees Parcel, the evidence before the trial court showed that the subsurface drain also diverted ground water from the property. Indeed, when the Skeeses disconnected from the subsurface drain, the water table rose, in part, because ground water could not drain as effectively. Thus, the trial court properly determined that the subsurface drain diverted water, not simply sewage, from the Skees Parcel. We, therefore, hold that the subsurface drain was a single drain that happened to

contain illegal sewage. It was not the combination of a private drain and an illegal sewer.[10]

[32] Finally, Frazee contends no evidence was offered that the subsurface drain was created by the mutual consent of all owners when originally installed and, as a result, that the trial court's conclusion is clearly erroneous as a matter of law.[11] However, we hold that the trial court was presented with sufficient evidence to determine that the subsurface drain, when established, satisfied the statutory definition of a mutual drain under Indiana Code Section 36-9-27-2, which, again, defines a subsurface drain as a drain that:

(1) is located on two (2) or more tracts of land that are under different ownership;

(2) was established by the mutual consent of all the owners; and

(3) was not established under or made subject to any drainage statute.

[33] The parties agree that the subsurface drain was not made subject to any drainage statute. And, in 2011, the subsurface drain was located on more than two tracts of land: the Frazee Parcel, the Skees Parcel, and the County Parcel.[12]

---

[10] To the extent Frazee argues that the presence of illegal sewage in a drain automatically converts that drain into a sewer, we disagree.

[11] Frazee also asserts that no evidence was offered that the present owners consented to the mutual drain. But Indiana Code Section 36-9-27-2 does not require present consent; it requires consent when established. *See* I.C. § 36-9-27-2.

[12] Again, the Dearths also had tied into the subsurface drain.

Thus, Frazee disputes whether the drain was established with the mutual consent of all owners.

[34] Although no evidence was offered regarding original ownership of the land, much less whether all original owners consented to the establishment of a mutual drain, the trial court could nevertheless infer the element of consent to establish a mutual drain. The evidence before the trial court demonstrated that the subsurface drain was installed, as one contiguous system, approximately seventy to eighty years prior to 2011, long before either the Skeeses or Frazee acquired their respective properties. And, in 2011, the drain passed through the land of three separate property owners, all of whom benefitted from the drainage provided.

[35] It is reasonable to conclude that a nonregulated, subsurface drain that predates the current, diverse ownership of the serviced parcels was, when placed, either (1) a mutual drain established by the mutual consent of all affected owners or (2) a private drain on a common estate. If the drain was originally created as a private drain on a once-common estate, it converted to a mutual drain when the land was subdivided. *See Johnson*, 594 N.E.2d at 803. And, as our holding in *Johnson* suggests, once a private or mutual drain is established, its benefits run with the properties it serves. *See id.* at 803. Thus, we do not find Frazee's argument persuasive, and we affirm the trial court's conclusion that the subsurface drain was a mutual drain when originally installed.

## *Issue Two: Abandonment*

[36] Next, Frazee contends that, even if the trial court correctly concluded that the subsurface drain was a mutual drain when established, it erred when it concluded that the Skeeses did not abandon their rights to that drain when they severed their connection in July 2011 with the installation of their new septic system.[13] She asserts that, in contrast to the trial court's finding that the severance was temporary, the evidence illustrates an intent to permanently abandon the subsurface drain. Specifically, to support her argument, Frazee references the placement of the boulder inside of the hole and atop the severed drain and the approximately six-month period when the Skees Parcel was disconnected from the subsurface drain.

[37] But Frazee does not identify the legal right—for example, a contractual right, a property right, or an easement—that the Skeeses purportedly abandoned. Irrespective of the legal theory upon which Frazee's argument is premised, a showing of abandonment requires that one prove an intent to abandon, and intent is ordinarily a question of fact for the trial court. *See, e.g.*, *Rogier v. Am. Testing and Eng'g Crop.*, 734 N.E.2d 606, 619 (Ind. Ct. App. 2000), *trans. denied*; *Right Reason Publ'ns v. Silva*, 691 N.E.2d 1347, 1351 (Ind. Ct. App. 1998); *Consol. Rail Corp., Inc. v. Lewellen*, 682 N.E.2d 779, 783 (Ind. 1997).

---

[13] Insofar as Frazee contends that the subsurface drain ceased to be a mutual drain when the Skeeses severed their connection, her argument is not supported by cogent reasoning. Ind. Appellate Rule 46(A)(8)(a). And, as the trial court found, the subsurface drain continued to service the County Parcel, in addition to the Frazee Parcel, after the Skeeses disconnected in July 2011, which means that the subsurface drain was still "located on two (2) or more tracts of land that are under different ownership." I.C. § 36-9-27-2.

[38] From the evidence presented, the trial court could reasonably conclude that the Skeeses did not intend to permanently abandon their rights in the subsurface drain. First, the Skeeses left the hole open where they disconnected the subsurface drain to allow water to continue to flow into the hole at least in part to gauge whether the drain still actively serviced their property. And, second, while ground water on the Skees Parcel could not openly flow into the subsurface drain after the disconnection, it could leach into the drain through the clay tile. Finally, the Skeeses reconnected to the subsurface drain when they constructed their perimeter drain in January 2012. This evidence supports the reasonable inference and, therefore, the trial court's conclusion that the Skeeses' severance from the subsurface drain in July 2011 did not evince an intent to permanently abandon their access to that drain. Therefore, the trial court's conclusion that the mutual drain remained a mutual drain at all relevant times is not clearly erroneous.[14]

### Issue Three: Trespass and the Perimeter Drain

[39] Because we affirm the trial court's conclusions that the subsurface drain was and remained a mutual drain, we also affirm the court's conclusion that the Skeeses did not commit a trespass when they connected their perimeter drain to the subsurface drain.

---

[14] We, therefore, reject Frazee's argument that the subsurface drain was a private drain instead of a mutual drain. *See* I.C. § 36-9-27-2 (defining a private drain, in relevant part, as one that "is located on land owned by one (1) person or by two (2) or more persons jointly.").

## Issue Four: Costs of Repair

Next, Frazee contends that the trial court erred when it concluded that she was solely responsible for the costs of the repairs made to the portion of the subsurface drain on her property.[15] In this respect, the trial court found and concluded:

> 12. Frazee was responsible to repair any breaks in the mutual [drain] on her property.
>
> * * *
>
> 36. During the time the problem was being solved, Frazee built a second pole barn in her barn lot in a location [that] sits atop the mutual drain on her property and sits in the path of the natural drainage swale[,] which has long existed on the Frazee Parcel.
>
> * * *
>
> 37. Frazee also chose to replace the original 4" clay drain pipe on her property with a 6' [sic] plastic pipe to the southwest of her second pole barn. Skees[es] are not liable for claimed damages on this issue since the repairs to her mutual drain on her property were her responsibility and done for her own convenience.
>
> * * *

---

[15] We reject Frazee's argument that, under Indiana Code Chapter 36-9-27.4, a landowner must always petition the drainage board before repairing a mutual drain. That provision provides a landowner benefited by a mutual drain with a mechanism to have an obstruction, "located outside the person's tract" but affecting the drainage on that tract, removed if the owner of the land on which the obstruction is found refuses, after a request, to remove it. I.C. § 36-9-27.4-9. The statute does not require Frazee to petition the drainage board to remove obstructions found on her own land, and the Skeeses, whose drainage was not affected by the obstructions to the subsurface drain on the Frazee Parcel, did not need to petition the local drainage board.

> Conclusion[s] of Law[]
>
> * * *
>
> 6.  Pursuant to [Indiana Code Section] 36-9-27[-2], a property owner is obligated to fix an obstruction, or break, in the portion of mutual drain on their property.

Appellant's App. at 14, 17, 19-20.

[41]    Frazee asserts that the trial court erred as a matter of law because Indiana Code Chapter 36-9-27 does not contain a provision "that obligates a property owner to fix an obstruction or break in a mutual [drain] on their [sic] property." Appellant's Br. at 37.  We agree with Frazee that a property owner is not necessarily liable for the full costs of repairs performed on a portion of a mutual drain located on that person's land.  In this respect, although the subsurface drain is not a regulated drain,[16] we find instructive our supreme court's opinion in *Crowel v. Marshall County Drainage Board*, 971 N.E.2d 638 (Ind. 2012), which considered the assessment of costs for the maintenance of a regulated drain to the property owners benefited by that drain.

[42]    When a regulated drain is deemed in need of periodic maintenance under Indiana Code Section 36-9-27-38, the local drainage board must "prepare a schedule of assessments" that, among other things, apportions costs to the

---

[16]  A regulated drain is "an open drain, a tiled drain, or a combination of the two."  I.C. § 36-9-27-2.  An open drain is "a natural or artificial open channel that:  (1) carries surplus water; and (2) was established under or made subject to any drainage statute," and a tiled drain is "a tiled channel that:  (1) carries surplus water; and (2) was established under or made subject to any drainage statute."  *Id.*

landowners benefited by the drain "based upon the benefit accruing to each tract of land from the maintenance."  I.C. § 36-9-27-39(2).  In creating the schedule and in apportioning costs, the drainage board may consider:

> (1) the watershed affected by the drain to be constructed, reconstructed, or maintained;
>
> (2) the number of acres in each tract;
>
> (3) the total volume of water draining into or through the drain to be constructed, reconstructed, or maintained, and the amount of water contributed by each land owner;
>
> (4) the land use;
>
> (5) the increased value accruing to each tract of land from the construction, reconstruction, or maintenance;
>
> (6) whether the various tracts are adjacent, upland, upstream, or downstream in relation to the main trunk of the drain;
>
> (7) elimination or reduction of damage from floods;
>
> (8) the soil type; and
>
> (9) any other factors affecting the construction, reconstruction, or maintenance.

I.C. § 36-9-27-112.

[43]     In *Crowel*, the drainage board assessed costs to Crowel for the repair of a regulated drain that did not touch his property, and he appealed.  971 N.E.2d at

639. Crowel's property sat at the high end of the drain's watershed, and his property had not flooded in the past. *Id.* at 641. Thus, he argued that he received no benefits from the regulated drain, and, therefore, the local drainage board, as a matter of law, could not assess any costs to him for periodic maintenance of the drain. *Id.* at 643.

[44] Our supreme court, however, rejected Crowel's claims. In so doing, the court noted that surface water runoff originating at Crowel's property contributed to flooding in the watershed, which the regulated drain was designed to ameliorate, and held that "a parcel of land at the high end of a watershed that has adequate drainage due to natural surface-water runoff can be benefited by the reconstruction of a regulated drain at the lower end of the watershed." *Id.* at 646. Further, the court stated that, "the fact that the Legislature included these criteria on the [Indiana Code Section 36-9-27-112 factors] list expresses its understanding that all property in a watershed is benefited when a drain serving that area is reconstructed, as well as its intent to spread the assessment across all of those benefited properties." *Id.*

[45] Although mutual drains are not subject to Indiana Code Chapter 36-9-27 and although a mutual drain's repairs are not assessed by a local drainage board, nonetheless, our supreme court's logic in *Crowel* applies equally to mutual drains. Thus, we hold that, at the least, the tracts of land under which a mutual drain is located benefit from the existence of that drain. Thus, a landowner is not necessarily responsible for the total cost of repairs made to the portions of the drain underlying that landowner's property, provided that other landowners

receive a benefit from those repairs. And a trial court may exercise its equitable authority to apportion the costs of a needed repair among the owners of the land under which the mutual drain lies. In apportioning costs, the trial court could consider, but is not limited to, the factors delineated by the legislature in Indiana Code Section 36-9-27-112.

[46] We disagree with Frazee, however, that the trial court here concluded that a landowner is always solely responsible for repairs made to a portion of a mutual drain located on his or her property. Instead, the trial court exercised its equitable authority when it assigned the full cost of the repairs made to the subsurface drain to Frazee. The evidence most favorable to the judgment demonstrates that the Skeeses were not actually affected by the broken portion of the subsurface drain on the Frazee Parcel or by the route that drain, once repaired, traveled. In contrast, Frazee needed to repair the subsurface drain to complete the installation of her geothermal system. At that time, Frazee did not know that the Skeeses' sewage was leaking onto her property through the break in the drain. And, moreover, Frazee built her second barn directly in the path of the swale, and Frazee damaged the drain with an auger during the construction of her barn and then rerouted the drain around the barn.

[47] Despite this evidence, Frazee asserts that she rerouted the subsurface drain because the Skeeses had not complied with the abatement order during the remediation period, which meant that sewage was flowing into the barn's construction zone. This, she maintains, delayed construction. And she states

that she had to replace the length of the subsurface drain because more water was sent to her property by the Skeeses' new perimeter drain.

[48] But these arguments require us to reweigh the evidence, which we will not do. Indeed, Frazee does not explain why she could not simply have repaired or replaced the existing subsurface drain in the same location where she had damaged it, which also would have kept sewage out of her construction zone. Moreover, the evidence most favorable to the judgment indicates that the Skeeses' installation of the perimeter drain did not increase the downstream burden placed on the subsurface drain. And, finally, with respect to the curtain drain that Frazee installed around her barns after the connection of the perimeter drain to the subsurface drain, the court could reasonably infer that the curtain drain's purpose was to divert the surface water collected by the swale, which would otherwise have traveled directly to Frazee's barns.

[49] Thus, the evidence and reasonable inferences support the trial court's finding that Frazee made repairs and changes to the subsurface drain for her own convenience—to construct the barn in the path of the swale. Further, the court's findings support its conclusion that Frazee was solely responsible for the repairs made to the subsurface drain.

### Issue Five: Frazee's Criminal Trespass, Treble Damages, and Attorney's Fees

[50] Frazee next challenges the trial court's conclusion that she had committed criminal trespass when she entered onto the Skees Parcel and disconnected the sump pump the second time. The trial court concluded that Frazee committed

trespass as defined by Indiana Code Section 35-43-2-2(a)(1), which, in 2011, stated:

> (a)  A person who:
>
>> (1)  not having a contractual interest in the property, knowingly or intentionally enters the real property of another person after having been denied entry by the other person or that person's agent;
>
> * * *
>
> commits criminal trespass . . . .

In relevant part, a person is denied entry under subdivision (a)(1) when "the person has been denied entry by means of . . . [a] personal communication, oral or written."  I.C. § 35-43-2-2(b)(1).

[51]  Frazee asserts that the trial court's conclusion is clearly erroneous because the record contains no evidence that the Skeeses denied Frazee entry onto their land.  The Skeeses counter this argument by noting that Frazee testified at trial on cross-examination that, on November 28, she trespassed to unplug the pump both times.  Further, they contend that they warned Frazee to not unplug the sump pump after she did so the second time because they were pumping water from the hole by order of the Health Department.

[52]  But the record does not demonstrate that the Skeeses denied Frazee access onto their property before she entered on November 28 to unplug the pump the second time, a prerequisite to criminal trespass.  Instead, when Frazee was

asked by opposing counsel whether she "trespassed on the Skees[es'] property," Frazee answered, "Yes, I did." Tr. at 74. However, a colloquial utterance of the word "trespass"—namely, her agreement that she entered onto the Skees Parcel without the Skeeses' consent—does not suffice to prove all of the elements of the multifaceted criminal trespass statute. Moreover, the record is clear that the Skeeses told Frazee not to unplug the sump pump only *after* Frazee had unplugged it for the second time on November 28. But for that entry to have been the criminal trespass, the statute required the personal communication to precede the entry. I.C. § 35-43-2-2(b)(1). Thus, the trial court's conclusion that Frazee committed criminal trespass pursuant to IC § 35-43-2-2(a)(1) is not supported by the record and is clearly erroneous.[17]

[53] Because the trial court erred when it concluded that Frazee committed criminal trespass, it also erred when it awarded treble damages and attorney's fees to the Skeeses under the Crime Victim's Relief Act in that an award of attorney's fees under the Act requires proof of a criminal offense by a preponderance of the evidence. *See Harlan Bakeries, Inc. v. Muncy*, 835 N.E.2d 1018, 1037 (Ind. Ct. App. 2005). The trial court erred when it concluded that Frazee had committed a criminal trespass and, thus, also erred when it awarded treble damages and

---

[17] Indiana Code Section 35-43-2-2(a)(4) also defines a criminal trespass as "knowingly or intentionally interfer[ing] with the possession or use of the property of another person without the person's consent." Although this court can affirm the trial court on any legal theory supported by the findings, the parties have not briefed this issue for our consideration. We, therefore, decline to consider it. *See Mitchell v. Mitchell*, 695 N.E.2d 920, 923-24 (Ind. 1998) ("[B]oth parties expressed their views [in their briefs] on the correct rule of law to the Court of Appeals. Under these circumstances, there is no surprise and no risk of the appellate court's introducing an unvetted legal theory.").

attorney's fees to the Skeeses based on a trespass. We, therefore, reverse the court's judgment on this issue.

### Issue Six: Frazee's Attorney's Fees

[54] The Skeeses cross-appeal and contend that the trial court abused its discretion when it awarded attorney's fees to Frazee in the absence of legal authority to do so. An award of attorney's fees is typically unavailable "absent an agreement between the parties, statutory authority, or other rule to the contrary." *Smyth v. Hester*, 901 N.E.2d 25, 32 (Ind. Ct. App. 2009), *trans. denied*. An additional exception to this rule is a party's "obdurate behavior," which occurs when another party is "dragged into baseless litigation" or the initial party "fail[s] to dismiss [a] suit once its baseless nature is discovered." *Wernke v. Halas*, 600 N.E.2d 117, 123 (Ind. Ct. App. 1992).[18]

[55] In light of these rules, we hold that the trial court abused its discretion when it awarded attorney's fees to Frazee. The parties did not have an agreement that provided for attorney's fees, and, because the trial court held that the Skeeses did not trespass onto Frazee's property, a conclusion which we affirm above, the court lacked statutory authority under the Crime Victim's Relief Act to award attorney's fees. Further, the trial court found that the Skeeses had complied with all orders from the Health Department and were fully cooperative in addressing the issues with their septic system. Thus, the

---

[18] Frazee's attempts to distinguish this authority are not supported by cogent reasoning. *See* App. R. 46(A)(8)(a).

obdurate behavior exception also does not apply here.  Therefore, we reverse the award of attorney's fees to Frazee.

## Conclusion

[56]    We affirm the trial court's conclusions that the subsurface drain was and remained a mutual drain and that the Skeeses did not trespass when they connected their perimeter drain to the subsurface drain.  However, we reverse the trial court's conclusion that Frazee committed criminal trespass, and, therefore, we also reverse its award of treble damages and attorney's fees to the Skeeses.  Finally, we reverse the trial court's award of attorney's fees to Frazee as contrary to law.

Affirmed in part and reversed in part.

Mathias, J., and Bradford, J., concur.